# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

STEPHEN E. STONE,

                    **Plaintiff,**

-vs-                                      **Case No.  6:04-cv-1571-Orl-JGG**

COMMISSIONER OF SOCIAL
SECURITY,

                    **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Stephen E. Stone ["Stone"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for disability insurance benefits and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.   PROCEDURAL HISTORY

On February 2, 2002, Stone filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of August 2, 2000 due to a degenerative disc disease in the lower back, bursitis in the shoulder and heels, and arthritis in the fingers.  R. 38-41, 47.  His claims were denied initially, R. 34, and upon reconsideration, R. 31.  On February 23, 2004, the Honorable Henry U. Snavely, Administrative Law Judge ["ALJ"], held a hearing on Stone's claim in Orlando, Florida.  R. 174-206.  Linda Reed, a non-attorney, represented him at the hearing.  R. 174. The ALJ heard testimony from Stone.

On May 18, 2004, the ALJ issued a decision that Stone was not disabled and not entitled to benefits.  R. 19.  Following a review of the medical and other record evidence, the ALJ found that Stone could not perform his past relevant work as a manager of a plumbing business, a buyer and supply administrator for an airline ground supply and equipment company, and a road service assistant supervisor for a power generation company.  R. 18, Finding 7, 56-57.  The ALJ found that Stone nevertheless retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of sedentary work.  *Id.*, Finding 11.  More specifically, the ALJ found that Stone could: occasionally and frequently lift and carry ten pounds, sit for six hours with normal breaks during an eight-hour workday; stand and walk for a total of two hours in an eight-hour workday, could push and/or pull in an unlimited manner, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  R. 16.  The ALJ also found that Stone had no manipulative, visual, communicative, or environmental limitations.  *Id.*  Applying the Medical-Vocational Guidelines, the ALJ concluded that Stone was not disabled.[1]  R. 17, 18, Finding 12.

On August 19, 2004, the Appeals Council denied review.  R. 4.  On October 25, 2004, Stone timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1. On July 8, 2005, Stone filed in this Court a memorandum of law in support of his appeal.  Docket No. 14.  On September 6, 2005, the Commissioner filed a memorandum in support of her decision that Stone was not disabled.  Docket No. 15.  The appeal is ripe for determination.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

## II.    THE PARTIES' POSITIONS

Stone assigns three errors to the Commissioner.  First, Stone claims that the Commissioner erred in failing to establish good cause for attributing insufficient weight to the opinion of the treating physician, W. Clark Davenport.  Docket No. 14 at 1.  Second, Stone argues that the Commissioner erred by failing to call a vocational expert in light of Stone's non-exertional impairments and inability to perform a full range of work.  *Id.*  Third, Stone claims that the Commissioner erred in failing to make proper credibility findings as to Stone's testimony.  *Id.*

The Commissioner counters that substantial evidence supports her decision to deny disability.  First, the Commissioner argues that the ALJ properly rejected the Dr. Davenport's opinion on the grounds that it was unsupported by objective medical evidence.  Docket No. 15-1 at 5.  Second, the Commissioner contends that a vocational expert was not necessary because it is required only when the limitations are severe enough to prevent a wide range of gainful employment at the designated level.  *Id.* at 9.  Third, the Commissioner argues that the ALJ properly assessed the credibility of Stone's testimony.  *Id.* at 12-13.

## III.    THE STANDARD OF REVIEW

### A.    AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.    REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes

-4-

disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

## C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under

sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings

of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.      DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931,

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special

duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all

the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts

and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

**B.      THE FIVE STEP EVALUATION**

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§

404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.

20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of

impairments which significantly limit his or her physical or mental ability to do basic work activities,

then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if

a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not

prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).

Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education,

and past work) prevent him or her from doing other work that exists in the national economy, then

claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe,

the ALJ must consider the combined effect of all of the claimant's impairments, and must consider

any medically severe combination of impairments throughout the disability determination process.

42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not

in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528,

534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the

physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

-10-

Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

-12-

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs

and laboratory findings show medical impairments which reasonably could be expected to produce

the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either
> (2) objective medical evidence that confirms the severity of the alleged pain arising
> from that condition or (3) that the objectively determined medical condition is of such
> a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th

Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See*

*Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054

(11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon*

*v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352

(11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

-14-

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.     MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### V.     **APPLICATION AND ANALYSIS**

### A.     THE FACTS

Stone was born on August 4, 1955 (R. 38), and was 48 years old on the day of the ALJ's hearing on February 23, 2004.  R. 181.  Stone graduated from high school.  *Id.*  Stone has past relevant work as an office purchasing manager for a plumbing business, a buyer and supply administrator for an airline ground supply and equipment company, and a road service assistant supervisor for a power generation company.  R. 56.  Stone is unable to perform any of his past relevant work.  R.  17, 18,

Finding 7.  He has not engaged in any substantial gainful activity since August 2, 2000, the alleged onset date of his disability.  R. 18, Finding 2.

In 1983, Stone was involved in a car accident.  R. 204.  On January 27, 1998, while he worked as a supply administrator airline ground supply and equipment company, Stone was evaluated by orthopaedic surgeon W. Clark Davenport.  R. 120.  Stone reported that, for a month, he had been experiencing lower back pain with radiation into his left hip, left knee, and occasional numbness of his left leg.  *Id.*  Stone stated the symptoms began on December 23, 1997 while he was on vacation in Ohio, but that the symptoms had not caused him to miss any work.  *Id.*  Dr. Davenport reported that on examination, Stone displayed mild spasm of the paraspinal musculature bilaterally with mild tenderness over the paraspinal musculature primarily on the left side. Dr. Davenport diagnosed lumbosacral strain with radiculopathy. Dr. Davenport administered Torodol for pain, ordered a physical therapy referral, and prescribed Daypro, Soma and Vicodin. Id.

On February 25, 1998, Stone returned to Dr. Davenport, and reported no improvement in his symptoms.  R. 119.  Dr. Davenport prescribed steroids, and gave Stone instructions on stretching exercises.  *Id.*  On March 11, 1998, Dr. Davenport examined Stone again.  R. 118.  Stone reported some improvement in his back pain, but noted that he continued to have symptoms of low back pain "with radiation down the leg on forward flexion and standing or sitting" for prolonged periods of time.  *Id.*  Dr. Davenport ordered a magnetic resonance image ("MRI") be taken of Stone's lumbar spine.  *Id.*

The MRI, dated March 20, 1998, showed a desiccated disc at L5-S1 with no evidence of a bulging or herniated disc. R 117, 123. The MRI also revealed a mild increased intensity in the L3

-16-

body possibly due to some sclerosis or a hemangioma. *Id.* Dr. Davenport recommended a bone scan, and at Stone's request, Dr. Davenport prescribed additional pain medication. R. 117. On May 7, 1998, Stone returned to Dr. Davenport for the results of his bone scan, which showed that the lumbar region was normal in appearance. R. 116.

On February 4, 1999, Stone returned to Dr. Davenport, and noted that prior to the visit, he had received epidural block injections. R. 112. Stone stated that "his original pain [was] now much better." *Id.* Stone, however, reported feeling "uncomfortable" pressure in his lower back that was not present when he woke up in the morning, but increased progressively throughout the rest of the day. *Id.* On examination, Stone again exhibited "good trunk range of motion," and improved extension without discomfort. *Id.* Dr. Davenport assessed degenerative disc disease "with improvement," recommended that Stone continue his home exercise program, and prescribed Celebrex and Loracet for pain and Ambien for insomnia. *Id.* Stone returned to Dr. Davenport on March 4, 1999 with similar results. R. 111. Stone exhibited good trunk range of motion with minimal discomfort, and a neurological examination was "within normal limits to both lower extremities." *Id.* Dr. Davenport referred Stone to another doctor for assistance in controlling pain without narcotic drugs. *Id.*

On October 14, 1999, Stone reported that while participating in a fishing tournament, he slipped and fell on his buttock which caused a flare-up of his low back pain. R 109. Dr. Davenport's examination revealed tenderness with palpation to the low back in the left and right L5-S1 facet region. *Id.* Trunk range of motion was good, but there was mild discomfort at the extremes of the ranges of motion. *Id.* Stone also complained of heel pain for the first time. *Id.* Dr. Davenport noted

that Stone exhibited point tenderness to palpation over the heels bilaterally at the plantar fascia insertion. Two x-rays taken of Stone's heels showed that they were normal without any evidence of fracture or dislocation. *Id.* Dr. Davenport diagnosed L5-S1 degenerative disc disease and bilateral plantar fascilitis. *Id.* Dr. Davenport administered a Toradol shot and prescribed Vicoprofen and Soma. He also gave Stone bilateral heel cushions and instructions on stretching exercises for his plantar fascilitis in addition to the home exercises already recommended. *Id.* Stone agreed to return in three or four weeks for a follow-up appointment or sooner if he had problems. *Id.* On January 20, 2000, Stone cancelled an appointment with Dr. Davenport. *Id.*

On May 30, 2000, Dr. Davenport diagnosed bilateral Hagland's deformity based Stone's reports of bilateral heel pain and on the x-rays taken during the previous visit. R. 108. The x-rays revealed a prominent posterior superior calcaneal tuberosity consisting of Hagland's deformity. *Id.* Dr. Davenport recommended "conservative treatment" of Vioxx, heel cups, application of ice to the leg, and leg elevation. *Id.* Stone also received refills of pain medication for his back problem which Stone reported as continuing to "occasionally flare up and bother him." *Id.*

On January 18, 2001, Stone sought treatment from Andrew E. Krupitsky, D.O., Stone's family physician. R. 101. Stone reported significant low back pain with radiation to his posterior left leg. *Id.* Stone also reported that he had just flown to West Virginia the prior week for his grandmother's funeral. *Id.* Dr. Krupitsky assessed degenerative disc disease of the lumbar spine and chronic pain with acute exacerbation. *Id.* Dr. Krupitsky increased Stone's dose of Methadone and decreased Loratab. *Id.* Dr. Krupitsky also ordered x-rays in light of Stone's complaints of persistent pain. *Id.* X-rays of Stone's lumbar spine were normal. R. 100, 102. On February 15, 2001, Stone returned to

Dr. Krupitsky, complaining of knee pain since he had twisted his knee three weeks prior to the visit. R. 102.  Dr. Krupitsky noted some mild soft tissue swelling at the medial aspect of the knee, and prescribed Vioxx for the knee pain.  *Id.*

Stone saw Dr. Krupitsky four times between April and November 2001, and kept Stone on a pain management regimen of Methadone, Loratab, and Soma.  R 95-99.  On April 5, 2001, Dr. Krupitsky saw Stone and reported that Stone had been compliant with his medication and offered "no complaints."  R. 99.  On September 7, 2001, Stone told Dr. Krupitsky that he was interested in obtaining disability status.  R. 96.  Two months later, on November 30, 2001, Stone informed Dr. Krupitsky that he could not find employment despite sending over 300 resumes and attending ten interviews.  R. 95.  Stone complained that he was "flat broke," and was "distraught."  *Id.*  During the same visit, Dr. Krupitsky noted, for the first time, that Stone exhibited antalgic gait and a "depressed mood."  *Id.*  Dr. Krupitsky treated Stone by providing "[e]motional support" and counseling on "alternative methods of financial support."  *Id.*  He also gave Stone samples of high blood pressure and cholesterol medication.  *Id.*

On February 2, 2002, Stone filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of August 2, 2000 due to a degenerative disc disease in the lower back, bursitis in the shoulder and heels, and arthritis in the fingers.  R. 38-41, 47.  On February 8, 2002, Stone reported to Dr. Krupitsky that he had found "some odd jobs to earn some money while awaiting disability [evaluation]."  R. 93.  The treatment note states that Stone "[h]as some discomfort R hand but he did work 13 hours using his R hand on [January 31, 2002]."  *Id.*  On March 18, 2002, Dr. Krupitsky noted that Stone "has reasonable control of chronic low back pain but

-19-

still with radicular symptoms BL lower extremities and ongoing numbness and tingling of the L anterior thigh." R 92.  Dr. Krupitsky also stated that Stone was "[s]till working part time."  R. 92.

On May 2, 2002, at the request of the Office of Disability Determinations, Stone was evaluated by Sam Ranganathan, M.D. R. 76-79.  Dr. Ranganathan opined that Stone could stand and walk for two hours per day, be seated for six hours at a time, and lift and carry occasionally twenty pounds and frequently ten pounds.  R. 77.  Dr. Ranganathan further opined that Stone had frequent postural limitations because of his lumbosacral spine condition.  Dr. Ranganathan also stated that Stone had no manipulative limitations, and had "[o]ccasional environmental limitations in the workplace like heights and driving in view of his LS spine condition."  *Id.*   Repetitive muscle testing produced fatigue. *Id.*

Dr. Ranganathan noted that Stone exhibited no motor or sensory disturbances in the upper extremities.  *Id.*  According to Dr. Ranganathan, Stone's left lower extremity strength was at 3 out of 5, with the strength at 4 out of 5 on the right.  *Id.*  Sensation was also decreased in the anterior aspect of the Stone's left thigh. Stone was able to walk without any assistive device, but tended to drag his left foot.  *Id.*  Stone found it hard to perform heel and toe walking with his left foot.  He  was, however, able to get on and off the examination table without any assistive devices.  He also bent forward and took off his own shoes and socks.  *Id.*  As Stone was leaving the office, Dr. Rangathan noticed that Stone avoided putting much weight on his left foot.  *Id.*

On March 12, 2002 and August 31, 2002, Stone answered questions about his daily activities for the Office of Disability Determinations in connection with his application for disability benefits. R. 64-69.  Stone reported that he takes breaks when he grills food, mops, vacuums, and does yard

work.  R. 68.  He also reported that he washes dishes with a dishwasher (*id.*) and does full loads of laundry with a laundry machine (R. 65).  He wrote that he does housework for five to ten minutes at a time.  *Id.*  Stone also stated that he shops for approximately ten to fifteen minutes at a time, using a shopping list to lessen his time spent at this activity.  R. 68.

On May 28, 2002, Dr. Krupitsky's notes show that Stone "[h]as need to remain physical owing to needed yard work and hour repair."  R. 90.  Stone also reported that he would soon be going on a trip to Key West.  *Id.*  On July 3, 2002, Stone reported to Dr. Krupitsky that he was experiencing an increasing flare of low back pain with numbness and tingling affecting his left lower extremity to the point of weakness. R 89.  Dr. Krupitsky's examination revealed that Stone was in mild to moderate distress with an antalgic gait.  Stone displayed a positive straight leg raise secondary to pain and guarding.  *Id.*  Dr. Krupitsky diagnosed chronic low back pain with lower left extremity radiculopathy. Prescriptions for Methadone, Loratab and Soma were continued. Id.

On July 16, 2002, Stone reported to Dr. Davenport intense and constant lower back pain with radiation to his left leg. R 107.  He reported that he could not sit or stand for more than twenty or thirty minutes at a time.  *Id.*  Dr. Davenport assessed tenderness bilaterally in the L5-S1 facet region. Stone's trunk range of motion was restricted secondary to discomfort. A neurological exam to both lower extremities showed decreased sensation in the L5-S1 face region on the left.  *Id.* Muscle strength testing was 5 out 5 in all groups except for 5- out of 5 in the left foot dorsiflexors. Stone displayed a positive straight leg raise on the left and walked with an antalgic gait secondary to pain in his left leg. Dr. Davenport diagnosed known L5-S1 degenerative disc disease with possible herniation at the same level, and recommended another MRI and an evaluation by a spine surgeon.

*Id.* Stone, however, was unable to afford the MRI and further evaluation without health insurance. *Id.*

During this office visit, Stone also told Dr. Davenport that he went to another physician for a disability examination and was "not pleased with what the doctor said." *Id.* Stone asked Dr. Davenport to fill out a disability report for him, and Dr. Davenport explained that he would need a functional capacity evaluation first. *Id.* Stone saw Donald Culbreth, a physical therapist, on August 30, 2002 for a functional capacity evaluation. R. 125-133. Culbreth found Stone capable of light work. R. 125. He based his opinion on Stone's maximum frequent lifting ability of fifteen pounds, Stone's ability to sit and climb stairs frequently. *Id.* He also stated that on an occasional basis, Stone was able to stand, walk, crawl, sustain reaching overhead, stoop, climb ladders, sustain reaching forward, and repetitively reach forward. *Id.* Stone could not tolerate crouching, static trunk bending, squatting, kneeling, and trunk twisting. *Id.* Culbreth also noted that Stone had no difficulties with simple grasp, fine manipulation, dexterity, and arm controls, "if [Stone] is given sit and stand options." *Id.* Stone reported to Culbreth "moderate pain at an intensity of 6-7 (0 = no pain; 10 = severe pain)." R. 127.

On September 27, 2002, a state agency physician concluded that Stone could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. R. 135. The physician also opined that Stone could stand, sit, and work for a total of six hours in an eight-hour workday, and that he had no exertional limitations in pushing and pulling. *Id.* The physician found occasional postural limitations for climbing, balancing, stooping, kneeling, crouching, and crawling.

On October 21, 2002 Dr. Davenport completed a Physical Capacities Evaluation form summarizing the restrictions imposed by Stone's impairments. R 169-171. Davenport opined that based on his diagnosis and findings, Stone needed complete freedom to rest frequently throughout a day of repetitive work activity. R. 170. Dr. Davenport stated that Stone could be seated for less than five hours, and stand and walk for less than two hours during an eight-hour workday. R. 169. He also opined that Stone had to alternate positions frequently and use a cane in order to stand or walk. *Id.* Dr. Davenport noted that Stone could bend, but could occasionally stoop. *Id.* Dr. Davenport opined that Stone could use his right foot only for repetitive movements as in pushing or pulling leg controls. *Id.* Dr. Davenport further opined that Stone could occasionally lift eleven to twenty pounds. R. 170. Stone could also use both of his hands for all repetitive action, and had no loss of grip strength in either hand. *Id.* Dr. Davenport also stated that Stone had to lie down or sit on a recliner for a substantial period of time during the day. *Id.*

From November 2002 until January 2004, Stone visited Dr. Krupitsky several times and was treated with pain medication. R. 142-50. On November 25, 2002, Stone told Dr. Krupitsky that he needed extra pain medication as he would soon be visiting his mother in West Virginia and would not be returning until January. R. 150. After returning from West Virginia, Stone visited Dr. Krupitsky and reported that he continued "to be stable on the [pain medication] regime." R. 149. On February 20, 2003, Stone saw Dr. Krupitsky and reported that he "[h]as been doing well with Methadone and Lortab for breakthrough pain." R. 148. Stone also told Dr. Krupitsky that needed a cane "with any attempts in ambulation outside his house." *Id.* Dr. Krupitsky assessed a "slow antalgic gait with the

use of [a] cane." *Id.*   Dr. Krupitsky maintained a diagnosis of degenerative joint disc of the lumbosacral spine with chronic pain. *Id.*

On April 1, 2003, Stone reported radicular symptoms affecting his left lower extremity with tingling numbness of his left thigh. R. 147. Dr. Krupitsky again noted an antalgic gait with the use of a cane and a positive straight leg raise on the left side. *Id.*   During Stone's next few visits to Dr. Krupitsky, Stone reported continued pain. R. 144-46. Dr. Krupitsky's treatment notes indicate Stone reported having financial difficulties which resulted in Stone selling his house and moving to Palm Bay to live with his parents. R. 146-144. On September 22, 2003, Stone reported to Dr. Krupitsky that he "[h]as been doing reasonably," and that he moved to Jacksonville temporarily before moving in with his parents.  R. 144.  On January 9, 2004 Dr. Krupitsky noted that Stone still displayed an antalgic gait with the use of a cane.  R. 142.  Dr. Krupitsky continued prescriptions of Methadone and Loratab.  *Id.*

On February 23, 2004, at the hearing, Stone testified that he could only sleep for two hours at a time because of his pain, but that in a typical night, he slept for about six hours.  R. 191.  His daily activities include staying at home, reading, and sometimes watching television.  R. 191.  He cooked for himself and his parents occasionally, chopping vegetables while sitting at the table or cooking while standing over the stove.  R. 194.  Stone also testified  he was able to drive a car by himself – sometimes to go to the store to shop for himself, or just to drive as an activity for about a half an hour "just [to] change the day a little bit."  R. 192.  He stated that he could still do some stretching for exercise.  *Id.*  Stone further testified that, at the time, he continued to go on fishing trips about once every month or two months.  R. 197.  He also testified that after August 2000, he attempted to work

-24-

cleaning apartments for a couple of hours per day; he tried to repair televisions at home; and he endeavored to work for a friend's plumbing company.  R. 183-84.  During that period, Stone continued to look for jobs, mainly in the purchasing field in which he previously worked.  R. 184.

### B.    THE ANALYSIS

Stone makes three arguments regarding error by the Commissioner.  First, Stone claims that the ALJ did not establish good cause for attributing less weight to the opinion of Dr. Davenport, the treating physician, than to other evidence.  Second, Stone claims in light of Stone's non-exertional impairments and inability to perform a full range of work (as opined by Dr. Davenport), the ALJ erred by exclusively relying on the grids and failing to call a vocational expert.  Third, Stone claims that ALJ did not make proper credibility findings as to Stone's testimony.

### 1.    The ALJ's Decision Not to Accord Substantial Wait to Dr. Davenport's Opinion

Stone contends that the ALJ erred when he improperly discounted the opinion of Dr. Davenport.  Stone argues that the ALJ did not articulate "good cause" for giving less weight to the opinion of the treating physician.  Docket No. 14 at 9.  The Commissioner counters that Dr. Davenport's opinion about Stone's inability to work is unsupported by objective medical evidence and is merely conclusory.  Docket No. 15 at 5.  The Commissioner is correct.

In assessing Stone's residual functional capacity, the ALJ considered three medical opinions: 1.) Dr. Ranganathan's opinion that Stone could perform a wide range of sedentary work; 2.) the state agency physician's opinion that Stone could perform some light work; and 3.) Dr. Davenport's opinion that Stone could not complete an eight-hour work day.  R. 16.  The ALJ found that Stone could perform sedentary work, according "little weight" to Dr. Davenport's opinion, "some weight"

-25-

to Dr. Ranganathan's opinion, and disagreed with the state agency physician's opinion by giving Stone "the benefit of a doubt." *Id.* The ALJ found that Stone could: occasionally and frequently lift and carry ten pounds, sit for six hours with normal breaks during an eight-hour workday; stand and walk for a total of two hours in an eight-hour workday, push and/or pull in an unlimited manner, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. R. 16. The ALJ also found that Stone had no manipulative, visual, communicative, or environmental limitations. *Id.*

The ALJ accorded "little weight" to Dr. Davenport's opinion because it was based on Stone's "subjective complaints that he could not complete an 8-hour day." *See* R. 16. As stated earlier, the ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. The Physical Capacities Evaluation form Dr. Davenport completed is a check-list type form and does not contain any diagnoses, descriptions of impairments, or clinical test results. R. 169-71. The form, in fact, provided space for Dr. Davenport to include "remarks on the above [checklist], diagnoses, [and] test findings," but Dr. Davenport left the space blank. *See* R. 171. In making his evaluation, Dr. Davenport did not have any current MRI or x-ray results. R. 107. The last clinical examination by Dr. Davenport was on July 17, 2002, and it was during that examination that Dr. Davenport stated that he would need to see the results of a functional capacity evaluation before filing out the Physical Capacities Evaluation form. *Id.* The functional capacity evaluation by Culberth stated that Stone was capable of light work. R. 125-133. In the Physical Capacities Evaluation form, Dr. Davenport never mentioned this functional capacity evaluation (despite his prior insistence that he needed it), nor why he differed from the physical therapist's opinion. R. 169-71.

Moreover, the medical records do not support Dr. Davenport's opinion.  Dr. Davenport's

evaluation of Stone's RFC is, in fact, inconsistent with his own prior treatment of Stone.  Stone's

complaints of pain were mainly mild, with Stone reporting to Dr. Davenport (three months before the

alleged onset date of Stone's disability) that his back problem "occasionally" flared up and bothered

him.  R. 108.   Dr. Davenport recommended, in his own words, "conservative treatment" (*id.*), and

most of the treatment occurred prior to Stone's alleged onset date.  R. 108-20.  The MRI and bone

scan Dr. Davenport recommended revealed normal results.  R. 116, 117, 123.  The only treatment note

by Dr. Davenport after Stone's alleged onset date is from the July 16, 2002 examination during which

Dr. Davenport told Stone to undergo the functional capacity evaluation by Culberth.  R. 107.

Dr. Krupitsky, another treating physician, never opined as to Stone's work-related capacities,

but also treated Stone very conservatively, mainly recommending pain medication.  R. 92-99.  As late

as March 2002, Dr. Krupitsky noted that Stone had "reasonable control of chronic low back pain . .

."  R. 92.  On May 2, 2002, at the request of the Office of Disability Determinations, Stone was

evaluated Dr. Ranganathan, who opined that Stone could perform a wide range of sedentary work.

R. 76-79.   Dr. Ranganathan also stated that Stone had no manipulative limitations, and had

"[o]ccasional environmental limitations in the workplace like heights and driving in view of his LS

spine condition." *Id.*  Physical therapist Culbreth and the state agency physician both found that Stone

was basically capable of light work activity.  R. 125, 135.  The ALJ did not err in according "some

weight" to Dr. Ranganathan's evaluation, particularly in light of two other opinions that Stone was

capable of *more* than sedentary work.  The ALJ was correct in stating that he gave Stone the "benefit

of the doubt" in finding that Stone had the residual functional capacity to perform sedentary work rather than light work.  R. 16.

Stone also specifically complains that the ALJ did not properly cite Dr. Davenport's physical capacities assessment, for instance, by stating that Dr. Davenport opined that Stone could sit for five hours, rather than for less than five hours.  Docket No. 14 at 9.  The ALJ's failure to state Dr. Davenport's exact opinions do not affect the fact that Dr. Davenport did not support his opinions with any objective findings or evidence and failed to explain his rejection of Culbreth's functional capacity evaluation.  The ALJ properly exercised his discretion in rejecting Dr. Davenport's opinion.

2.    The ALJ's Exclusive Reliance on the Grids

The ALJ found that the evidence supported a finding that Stone could perform the full range of sedentary work, and used the grids to find that Stone was not disabled.  R. 17.  Stone claims that the ALJ erred by exclusively relying on the grids.  Stone contends that, in light of his non-exertional impairments and limitations (of pain, use of a cane, and inability to bend and stoop) and his inability to perform a full range of work (as opined by Dr. Davenport), testimony of a vocational expert ("VE") was necessary.  Docket No. 14 at 10-12.  The Commissioner correctly responds that non-exertional impairments require a VE's testimony only when the limitations are severe enough to prevent a wide range of employment at the given work capacity indicated by the exertional limitations.  Docket No. 15 at 9; *see also*, *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).

Stone's argues that the Commissioner is precluded from relying exclusively on the grids when there are a combination of exertional and non-exertional impairments, and cites Stone's non-

exertional impairments as his symptoms of pain, his use of a cane, and his inability to perform work requiring "prolonged walking or standing, or repetitive bending and stooping." Docket No. 14 at 11. Stone supports his argument for severe non-exertional impairments by relying on Dr. Davenport's opinion, which, as previously stated, the ALJ properly rejected. The rest of the opinions on Stone's RFC all state that Stone could perform the full range of either light or sedentary work. Dr. Ranganathan, on May 2, 2002, reported that Stone was able to walk and get on and off the examination table without any assistive devices. R. 77. The functional capacity evaluation does not mention that Stone needed to use a cane (R. 125-33), but shows that on an occasional basis, Stone was able to stand, walk, crawl, sustain reaching overhead, stoop, climb ladders, sustain reaching forward, and repetitively reach forward (R. 125). The state agency physician's findings were similar: Stone had only occasional postural limitations for climbing, balancing, stooping, kneeling, crouching, and crawling. R. 135. Thus, the opinions by the doctors and the physical therapist, properly considered by the ALJ, do not indicate that Stone had limitations — whether exertional or non-exertional — that were severe enough to necessitate VE testimony.

Further, substantial evidence suggests that the non-exertional impairments Stone claims were not so severe as to preclude the full range of sedentary work. Stone's reports and testimony show that he is relatively active, even with his impairments. The ALJ correctly noted that Stone grills food, vacuums, mops, does yard work, washes dishes with a dishwasher, and shops for food in the store. R. 15; *see also*, R. 65, 68. Stone goes on fishing trips about once every month or two months. R. 197. Between January 2002 and March 2002, Stone reported to Dr. Krupitsky that he was working

occasionally.  R. 92, 93.  Stone also complained of discomfort in his right hand, but Dr. Krupitsky's notes indicated that Stone worked for thirteen hours using his right hand on January 31, 2002.  R. 93.

According to Stone, after his alleged onset date of his disability, he took occasional jobs such as cleaning apartments and repairing televisions.  R. 183-84.  While Stone did only intermittent "odd jobs" (R. 92), his activities, including working for thirteen hours during one day, do not support his complaints that his non-exertional impairments were severe enough to preclude sedentary work.  Stone's past relevant work was mainly as a purchasing manager and a buyer, and did not require much strenuous activity; the ALJ even noted that he gave Stone "the benefit of a doubt" that Stone could not perform any of his past relevant work.  R. 17.  Because Stone was able to perform unlimited types of work at a given residual functional level, the ALJ did not err in failing to call a VE.  Substantial evidence supports the ALJ's specific finding that Stone's non-exertional limitations were not severe enough to preclude a wide range of sedentary employment.

3.     The ALJ's Treatment of Stone's Testimony

Stone claims that ALJ did not make proper credibility findings as to Stone's subjective complaints of pain.  Docket No. 14 at 12-15.  More specifically, Stone contends that the ALJ failed to properly apply the Eleventh Circuit "pain standard."  *Id.* at 12.  As stated earlier, the ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).    While the ALJ did not specifically cite the Eleventh Circuit "pain standard," the ALJ did not err in evaluating Stone's pain symptoms and his testimony regarding pain.

The ALJ considered "all symptoms, including pain, and the extent to which these symptoms may reasonably be accepted as consistent with the medical evidence and other evidence." R. 15.  The ALJ also considered medical opinions that "reflect judgments about the nature and severity of the impairments and resulting limitations."  *Id.*  The ALJ stated (after considering all of the medical opinions and conducting writing a review of Stone's medical records and evidence) that he did not find Stone's testimony to be "fully credible" because Stone's daily activities show that he is capable of performing a "wide range of activities at his own pace and despite his pain," and because the evidence supports a finding that he could perform sedentary work.  R. 16.  Stone also briefly argues that the ALJ erred specifically in using Stone's daily life activities to discredit his testimony.  Docket No. 14 at 14-15.  Again, the medical opinions cited earlier, Stone's own reports, and other evidence considered by the ALJ are simply not consistent with Stone's complaints of disabling pain.  Based on substantial supporting evidence in the record, this Court will not disturb the ALJ's clearly articulated credibility finding.

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

-31-

should enter a judgment and close the case.

      **DONE AND ORDERED** this 22nd day of February, 2006

                                      JAMES G. GLAZEBROOK
                              UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia       30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL          33602

The Honorable Henry U. Snavely
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL         32817